Tom Normandin for appellant and Lofty Murich for appellee. All right, Mr. Normandin, you were substantially late for this argument, and I know that having read the record, your opposing counsel was late for trial, so I think you both owe each other a handshake at some point in time, at a minimum. So we'll let you proceed. Do you wish to reserve any time? Yes, five minutes, Your Honor. All right, you may proceed. Thank you, Your Honor. My name is Tom Normandin, and I represent the appellant, Nexgear Capital, Inc. In this appeal, Nexgear seeks a reversal of the bankruptcy court's judgment in favor of the debtor, the appellee, Mr. Kazaz, because during the trial, Nexgear presented a prima facie case that the debt should be accepted from discharge, and thus the bankruptcy court committed clear error when it rendered judgment in favor of the appellee. What Nexgear does as a business, it provides flooring lines to licensed automobile dealers throughout the United States. It has about 20,000 dealers that it provides lines to, and it doesn't make consumer loans. It's just a business-to-business lending relationship. In September 2019, an employee of Nexgear visited the debtor's place of business called CarMax and went over with Mr. Kazaz how the line of credit works. He obtained Mr. Kazaz's driver's license number, his dealership number, his Social Security card number, and all these documents that evidenced the loan were signed using DocuSign. The only thing that was required to have a personal signature of Mr. Kazaz was a power of attorney, which was obtained and notarized by a third-party notary, Sylvia Garco, who testified at trial. And during the six-day span after the loan docs were initiated, CarMax, owned by Mr. Kazaz, made payments, quote-unquote, of over $868,000. And in return for those payments, Nexgear released those titles to the vehicles that had been floored by Nexgear. Once those titles were released, Mr. Kazaz was able to sell those vehicles. Talk to me a little about the timing of this and when your client releases title. So the titles are held. That's your collateral. You acknowledge, apparently you release title before you actually receive the money? No, we would receive an ACH automatic clearinghouse payment. And so... Once that is received. Okay, and you don't wait for it to clear. No, we don't. Okay, okay. And, yes, so that's how the process works. And so during this six-day period in which over $868,000 was paid through the ACH wires, the titles were released, and this included a Thanksgiving Day holiday. Now, this was a $250,000 line, right? Right. So what was happening was it was repeatedly, you know, they'd identify a car, your client would get the title, then they'd clear the car, and your client advances the money to get the car, gets the title. So it's revolving very rapidly. Very rapidly. And it's not unusual that this kind of purchases and sales and release of titles occurs. It's very quick. It inures to the benefit of the dealers because they're able to take the cars from typically the auctions. They go and buy a car, use our flooring line to purchase the car at auction, put it on their lot, sell it within days of it being on their lot, that's the model, and then immediately get title back to the consumer. And as long as the money that is paid to my client next year is good money, everything works perfectly. But it didn't work perfectly in this case. And within a matter of days, in early December, the NSF notices from Chase Bank, which is CarMax's and the debtor's bank, started coming in. Eric Stevens, the account manager who testified at trial, immediately went over to CarMax's place of business, the same business that he obtained the driver's license and Social Security card of Mr. Cazaz, and all the cars are gone. All the records are gone. Nothing is there. They just disappeared. So he declared bankruptcy, obviously, Mr. Cazaz did, and we filed the adversary proceeding. We called as a witness during the trial a gentleman by the name of Jamie Cuevas. He's from Chase Bank, and he testified that the same information that was given the next year to open up the loan was given to Chase Bank to open up the account. So we're dealing with the same person. There's no misappropriation of identity or anything like that. It is the debtor, Mr. Cazaz. And Mr. Cuevas from Chase Bank also testified that it was only Mr. Cazaz who could have stopped payment on those wire transfers. Now, was the NSF the result of stopped payment, or was the NSF a result of something else? It was a combination. It would involve both a physical stopped payment, which is in evidence, and then also later on NSF. The wires came back with insufficient funds notices. Okay. So we sued him, and I took the deposition of Mr. Cazaz, and he denied on multiple occasions under oath that he even knew who Nexgear was or having ever done business with Nexgear. He did admit during his deposition that he had destroyed all of CarMax's business records. So on the one hand, he denied ever knowing Nexgear, but on the other hand, he said he was the sole president, employee, officer, custodian of CarMax's records. And what's important about that is that as part of the loan, Nexgear takes those records as part of its security so that it can trace where his cars went. If the car has ended up being sold to a bona fide purchaser, Nexgear has lost his collateral. Right. If the car is sold to someone other than a bona fide purchaser, Nexgear does have a claim to the physical repossession of the car. The deposition transcript was filed with the court. A pocket brief about Mr. Kazaz's inability to produce documents at deposition was filed with the court before trial. And ultimately, during the trial, the court ruled that I was not able to read into the record a very short portion of the deposition transcript, not the entirety of it, but a very short portion describing how it is Mr. Kazaz's business. There are no records. And we pointed out in our brief that the bankruptcy court's refusal to listen to the deposition transcript was overly harsh. There were other remedies available to the bankruptcy court, including sanctions or continuing the trial perhaps to allow whatever needed to be done in the interim or compliance with the local rule. But it all fell on deaf ears. So why didn't you call Mr. Kazaz at trial? He's there, right? Yes, he was there. He was not called because I had the deposition transcript and I had lodged it with the court and I believed that I could read the portions into it. I did not need his live testimony. And did the other side, there was no objection to the introduction of that testimony by Mr. Kazaz before trial or was there? Before trial, no, there was no objection to the raised at the deposition, nor was there any type of motion to eliminate file before trial. Was there a deadline for such motions set by the court? I don't know off the top of my head. I think there, well, this is kind of an unusual case in that the court was upset that we were not in full compliance with his pretrial orders and I think he just set the matter for trial and did not order compliance with his local rules. That's what I think occurred here. Okay. But so, counsel, it's still not clear, though. When you realize that you were not going to be able to read the transcript before you rested, you could have called Mr. Kazaz. The answer that he wouldn't let me use the transcript doesn't explain why you didn't still put Mr. Kazaz on the stand, does it? We had a translator at the time of the deposition, and it was at that time that I came to understand that Mr. Kazaz did not understand English sufficient enough to answer questions without a translator. Well, what's interesting is that you told the story at the beginning of your argument that your client met with Mr. Kazaz at his place of business before the loan was transacted. Did he have a translator with him at that point, or did Mr. Kazaz allegedly understand enough to enter into this business transaction with your client? He certainly gave the representative, Mr. Stevens, the impression that he understood what was going on. He had a dealer's license, which requires some understanding of the language. So, yes, the client was under the impression that at that time he understood what was going on. It's not unusual, Your Honor, for people to ask for translators. Not that they don't understand English language. They just feel more comfortable in their native tongue, if you will, and that's not that unusual. I appreciate it, but he had to walk through the loan documents, had the transactional nature of what was going to occur, what the responsibilities next year would have been, what the responsibilities of what Mr. Kazaz's CarMax would have been. All of this would have had to be explained before he would have signed anything so that they would have understood each other when the agreements were executed. Complicated commercial transaction. Yes, Your Honor. I will point out that in the schedules by the debtor, he makes reference to another competitor of NextGear's, AFC. They, too, are a flooring lender for used car dealers, and so my supposition is that he had a sufficient understanding of what he was signing and entering into both with us and with our competitor, but that he felt more comfortable with a translator. In terms of testimony? Correct. All right. You're into your five minutes. Do you wish to reserve the rest of your time? I just will take a real quick second and point out that the argument of estoppel and ratification was not addressed by the Bankruptcy Court. It applies here. Mr. Kazaz should not be able to, at this late point in time, and say that, oh, it was his brother or somebody other than him who did stop the payments and issued the checks for non-sufficient funds, and I will reserve the remainder of my time. All right. Thank you. All right. Counsel, you finally get to make your argument. Good morning, Your Honors. Bob Pimerich, appearing on behalf of the appeal. The legal standard is clearly erroneous. I don't believe that the appellant met that burden in his briefs and his replies, and the court is correct in its finding. Let's start with the issue of proof. Throughout the trial, the court was frustrated not finding sufficient proof for what the trial counsel of the appellant believed that he proved. So let's start with the issue of dischargeability. And one of the issues that was raised by Mr. Normand in his brief is about the dischargeability under 11 U.S.C. 523A2, subsection A. And the misrepresentation must be made for the fraud perpetrated at or before the time that the money or property is delivered to the debtor. Now, the court was correct. Mr. Normand could not meet that burden, could not prove that the debtor had intended to defraud the next gear. As a matter of fact, the court stated that Mr. Normand could not even prove that there was a contract and we were having problems during trial who signed that contract. With respect to the cases that Mr. Normand had quoted, he quoted something going to... He quoted Field v. Manns, 516 U.S. 59, 116 Supreme Court case. But in that case, Manns filed a bankruptcy and the adversary, the Fields, discovered from the whole of records that Manns has breached, and I stated this in my brief, that there was a... that the debtor had intent to defraud at the time that he had borrowed the money. Are you saying on this record there's no evidence? I mean, you know, one of the things the judge says repeatedly is there's no evidence, and that's simply wrong. I mean, money was lent into an enterprise that disappears after a few days and your client destroys or someone destroys the record. So I don't think there's any lack of evidence that there's a massive fraud here. Do you disagree with that? I disagree, Your Honor. What happened to other... You know, there's... Well, let's not even go there because that's just metaphysically I'm going to get to another place. Let's talk about something that I care about a little bit more, which is the denial of the right to use the... or the ability to use the transcript. At trial, you represented that your client had never had an opportunity to review that document, but that was false, wasn't it? No, that's not false. That's very true. The client did not review the transcript. Okay, that is not false. Was it provided to them by the court reporter? It was provided to them by the court reporter, correct? No, it wasn't. Was it provided to you? I was looking for it, and it was not provided to me. I was expecting a transcript, hard paper transcript that I can convey to my client that he can read and he can make corrections and return. And we did not get that. So, with respect to that issue, the court had addressed that issue clearly in the motion for a new trial that Mr. Normandin filed. Well, he filed a motion for reconsideration, and the bankruptcy courts basically said, okay, I denied it for two reasons, one being the representations made at trial. That wasn't accurate. So, now I'm going to deny it as a local rule violation, correct? No, he's denied it initially. I'm talking about motion for reconsideration. He denied it as a local rule violation, correct? I am not following your argument. What I understand is the court, in the transcript itself of the trial, he denied it pursuant to the court rule because the – if I may, Your Honor. I think we're saying the same thing. At trial, he had a couple of reasons. Then there's a motion for reconsideration. And at that point, he's saying even if reason one doesn't work, he still didn't specifically identify the paragraphs that he wanted to use. That's a local rule violation. I'm going to deny use of the transcript. Is that wrong? Yeah, this – my understanding is that the officer's certificate that was attached to the deposition did not comply with the federal rule of civil procedure 30, subsection E, subsection 2. Okay. So, let's make it easy because what I understand from the ruling of what you're saying are a little different than maybe me. But when we have these kind of rulings, so he's saying I'm not going to take it for a reason of compliance, what was the prejudice to your client in connection with those particularized problems? Now, put aside, if your client absolutely didn't have a chance to see it, I get that. That's easy. But if the determination was made that he had the ability to see it, there was just some reason he didn't do something. So, the only problem is a certificate's not up to snuff, what you're saying, or my understanding that he didn't identify specific paragraphs. What was the prejudice to your client? Well, the prejudice to my client is that if he goes and starts reading from a transcript that my client did not approve, did not change, he had that right, and that right he didn't have now. That's the prejudice. He could have changed this. Okay. Understood if that's the basis for it. But I'm saying what if we put that aside and it's something more technical. You mentioned a certificate problem or a failure to, which I think is undisputed, a failure to say in this transcript I'm going to point to these particular things. What was the prejudice to your client of that? Well, it's due process. You're there to represent him. Why is that a due process violation? Because he has not looked at those before, and he has not reviewed them, and he has not signed them. All right. You're not answering the question I'm answering. I agree with you on the point you're making, but you're not answering the question that I'm asking. So, let's move on because I don't think I'm going to get an answer. Continue. Okay. Now, with respect to the harm that had come to Mr. Normandin from not having this deposition read, it is articulated in the court's docket number 70, where the court says that the client, Mr. Kazaz, was there. He could have been testifying, and he wasn't. Moreover, that even if there is no interpreter there, he could have asked for a continuance of that trial, and he did not do so. So, we are now asked to explain a deposition that even this, assume your honors, that even if this deposition, this evidence comes in, it will show destruction of records, which records are available elsewhere. The records should emanate from themselves. They have records of everything that they should prove to show whatever they need to show. That's number two. They have the internal emails of the business? They don't have everything they need to prove it? That's a gross exaggeration. Well, no, your honor. Not if Mr. Normandin had not conducted any discovery at all and waited till the last minute to depose the client. After discovery closed, he went and started doing something that I find really surprising to ask for records from the bank, and even those records that he had provided did not rise to satisfying his burden of proof. So, let me just continue, your honor. Go ahead. With respect to the dischargeability then, there is no misrepresentation by Mr. Cazares. There wasn't even sufficient evidence to show that there was an agreement, that there was a meeting of the mind. Counsel, do you disagree that CarMax requested the release of titles from NextGear on the vehicles that have been identified in, I think it's the payment detail? My client did not testify to that, your honor. No, I'm not asking that. I'm asking do you deny that there was evidence that there was a request to release titles made by CarMax? It has been denied in his answer, your honor. So there's no evidence of that in the omitted exhibits? I am not sure. I have not reviewed all the exhibits. All right. No, no, no, let me ask some of these questions because your time is coming short. So is it your position that there's no evidence of stop payments in the record for payments from CarMax to NextGear? No. No that there's no evidence? There was evidence that has been stated by one of the witnesses that there has been some stops on certain checks. I thought that it was bank records. I thought the bank records said stop payment. I thought the bank records reflected numerous NSFs, including payments to NextGear for $60,000, $30,000, and $60,000. That's what I thought was in the record. There was that evidence there that there was stop payment or there is insufficient funds. All right. And your position and argument has been that we don't know who did that, correct? Our argument is that it's not an argument. It's that Mr. Kazaz is denying that he had requested any of those things to happen. Well, he didn't testify. The only testimony is from the bank who says he's the only person who could have done that. Right. Correct. But that's been given by a manager who was not the manager of the branch, and all the banks do have some businesses or business section that deal with their customers and that they know them. And that manager who is in charge of that branch was not the bank. Did you put on that evidence? You didn't put on a banker who put on that evidence, did you? You're telling us all banks do this, but did you have an expert that tells us all banks did that? No, but I did not provide that evidence. I did not provide evidence on what other banks do. Right. Okay. Your time is up. I don't want to take up any more of your time. Thank you very much for your argument. All right. What do we have left? Three minutes and 16 seconds. Thank you, Your Honors. I don't know if I answered Judge Gan's question completely, but I will point out regarding the language issue that arose during this case. But on page one of the trial transcript, the court at the very beginning of the trial asked, is there anyone here for the defense? Quote, is Mr. Kazaz here?  Why don't you step forward and come to the microphone? Are you without counsel? Do you speak English? Mr. Kazaz said, not really. And that is consistent with my understanding that he really didn't understand English, and me putting him on the stand wouldn't have achieved anything. That's where I was coming from. Counsel, can I take you in a different direction? I want to ask, what is the exact fraud here, fraud, fraudulent misrepresentation, that you believe supports the 523 action? The fraud is the representation that these are good funds, when in a very short amount of time, those funds turned out to be insufficient and stop payments. All right. That's a big deal because Judge Clarkson believed that you were arguing the fraud happened when the initial agreement was executed. That's not what you're arguing? No. No, and I think what Judge Clarkson actually said was that the fraud had to have occurred at that time, which I think is irrelevant. Okay. But you are arguing that the representations that next year should release the title because funds have been tendered was false, and it is the fraud. And that's a case-by-case, that's a transaction-by-transaction analysis almost, isn't it? Yes, it is. There are many, many people, me in my younger days, would pass a check for insufficient funds. So that's not fraud. But when you take the totality of the circumstances, the amount of checks involved in a very short period of time, six or seven days. When I looked at the bank statements that were attached and were admitted into evidence, I did not see any funds that came close to ostensibly covering those checks. Is that the situation? Why isn't that evidence of fraud? There is substantial bank records indicating the total fraud amount of the loss is actually established by next year's internal records of how much money they had advanced on behalf of the borrower and was not repaid those funds that had been advanced. I thought Judge Clarkson had a big problem with not being able to match items, not being able to match the stop payment to the vehicle, to the payment that was supposed to be coming, and then to cancel checks. Isn't that a problem in establishing the fraud on an individual transaction basis? No, Your Honor. When you measure damages, the existence of the damages, and in this case the existence of the fraud, must be proven with some degree of certainty. The amount is less stringent. You can use various methods in establishing the loss. All right. Well, your time is up. Thank you for your good arguments, and we will take this matter under submission. Thank you. Thank you. Thank you. Thank you. And we have concluded, and we will be in recess. All rise.
judges: Taylor, Spraker, Gan